and the Sioux Honey Association, 2009-11-63, Miss Perry, Miss Perry, Miss Perry, Miss Perry, Mr. Marshack. Good morning. I appear on behalf of Chinese respondents to challenge the Department of Commerce's determination in its second annual review of the Anti-dumping Treaty Order on honey from China for the period December 1st, 2002 through November 30th, 2003. We raised three issues on appeal, all of which relate to the manner in which the Department calculates its surrogate values. We know our burden is great. As I am certain you will hear today from the Department of Justice and Petitioner's attorneys, as they have argued in their briefs, the Department is entitled to considerable discretion as to how they interpret the anti-dumping law, and they will argue that this Court cannot substitute its judgment for that of the agency or re-weigh the evidence. We accept our burden, since we know that this Court also recognizes that DOC discretion only goes so far. The Department is required to calculate margins as accurately as possible. That's the key to the dumping law. Also, the Department cannot accept surrogates which lead to absurd results. To calculate accurate margins, the Department should rely on as broad a representative sample as possible, and this is critical for our case. The fact that the sample size may have many price points does not matter if the sample is unrepresentative, and there we refer to the data they used to calculate the surrogate value. You're talking about the EDA? The EDA data. Is it your position that the EDA, they used the EDA alone and didn't rely on the three articles you're posing, but is your position that what they should have done is not just a combination of the EDA and the three articles? Yes, Your Honor. We accept the fact that the EDA data represents the price of raw honey in one region of India for a representative period, but it's a very limited period. It's the first half of the period of review, and it's one region, and it's high-priced honey. We believe that the record shows that the price of honey is very volatile, and we believe the record shows the price of honey actually declined in the second half of the period of review. So what the department did is, by accepting this price as the price for the entire POR for all of India, it ignored substantial evidence on the record as to what the price should be when you look at all of the evidence. Well, but they had reasons for discounting the Kerala article and the Jharkhand article and the Girijan article. Yes, Your Honor, and we believe that a lot of the reasons they used to disregard those articles are the same reasons they could have used to disregard the EDA data. For example, they say that the articles are only for one period, the articles are only for one region. Single beekeepers, single producers. Single producers, but if you're operating in a market economy, the single producer represents the market. The single producer is selling at a market price, because India is a market economy. So the fact that it's a single producer is what we're saying is not a valid reason to reject this article. The EDA data, I mean, we admit it has a lot of price points, but the fact that it has a lot of price points doesn't really mean that those price points are representative as to what the price of raw honey is within India, within all of India, for the entire period. So the EDA data is part, but the reasons that they rejected our data, you could reject the EDA data for the same basic reasons. It's not representative of a price throughout India for the entire period of review, and it's critical in this case, because it has a liability. But EDA was multiple producers for the largest area in India. I don't believe the record shows it's the largest area. It is a honey producing region, but I believe the record's going to show that other regions in India are just as significant in honey production. If you look at the EDA data, again, it's one region. The other articles are data from three other regions throughout the POR. Was the EDA data compiled by a first year business student? I don't know who the EDA data is. The EDA data is on the Internet. The EDA has a wonderful website. That's the Kerala article, of course. Well, Your Honor, they're articles. I mean, this is tough. I mean, it's very tough because we're dealing with information that we get from India on the Internet. I'm not saying that the EDA data is not good data for a particular region for a particular period. What I'm saying is that you have all this other data that the Department just says, no, no, no, no. They reject all the other data we put in the record, and then they reject the other evidence that we put in the record where we show that the price is very volatile. You look at the EDA data itself. It shows from one year to the next, prices jump. And then, very significantly, you have the Tribune article, which was published in December. Prices in the Kerala region generally are lower. The economy is not as strong there. Prices are going to be different in different regions of India throughout the period, and that's the exact point we're making. They've relied, again, on one period, one piece of data, even though it has multiple price points. But of critical importance to us, you look at the Tribune article, which the Department used in another review, which the Department has said is a reliable source of data. You look at that Tribune article, it says that the price is declining in the second half of the POR, and very significantly, it says even if the price was 40 rupees per kilogram, Indian beekeepers would still be making honey. So here you have the Tribune article saying that you can make money at a price of 40 rupees per kilogram in India. So it was happening in India, it was happening in EDA, that you had this tremendous ability of the India beekeepers to make a tremendous profit. If you could make money selling honey at 40 rupees per kilogram, the EDA data shows 76. So basically you're taking, and what was the reason that they had this tremendous price increase in the EU was banning Chinese honey. So the Indians just kind of moved in, and there was a tremendous demand throughout the world because of a non-market force where the European Union puts a ban on Chinese honey, so the Indians could increase the price of honey. And then you're taking that same Indian price, which has this tremendous profit, and you're saying that's the surrogate value of Chinese honey, where the Chinese, if there's a ban on their export of honey, the Chinese price would be even lower. So we're getting hit really from all points. What they're using and what they're rejecting, what we're saying is the department is not looking at the entire record. They're not looking at all the evidence we're putting in. And one more critical point. It's not that they're not looking at it, there's no question here that they're looking at it because they were required to go back and opine as to what was not reasonable or why they didn't use it. So they looked at it. You're just disagreeing with the bottom line as to the usefulness and utility of it. I'm more than, I guess, if I just say I'm disagreeing with the bottom line, I'm saying we're re-weighing the evidence, but I'm not doing that. What I'm saying is their whole methodology is flawed. What they're doing is they're looking at each piece of data that we put on the record in isolation. If you take one of our articles, if we had just one article and the EDA data, and you put those up there on a board and say, well, which is better? You know, I'm going to have to say that the one article to the EDA data, the EDA data is better. But that's not the point. I mean, what they should be doing is looking at the totality of the evidence and trying to make the correct decision to get the most correct database as to what's going on in India throughout the whole POR. What they've done is they go one by one and knock us down. You say that the Commerce set the normal value based on a raw value of $1,800 per metric ton. Where did you get that from the record? The raw value of honey, that is, I think... Where was that in the record? I had my clerks searching. We couldn't find it. I hope we had a site as how it's derived. It would be from one of the confidential exhibits, and I think we didn't use a confidential number, but that would be the data of raw honey that is on the record. It is in this database. Can you give me a page site and I'll look at it? Would it be possible for me to send something in afterwards? Right now, hopefully I can get it after I sit down, but I may not be able to. Thank you. But I absolutely can get that, because that's there. So again, what we're saying is on this particular issue, what the department did is they take one piece of evidence that we put in and compare it to the E-Data, and as constant one by one, they knock down every single piece that we have, because the E-Data is not that bad. But what they didn't do is they didn't look at the totality of the record, and they especially ignored all the evidence in the Tribune article as to how Indian beekeepers can make a profit selling at 40 rupees per kilogram, and how the tremendous increase in Indian prices in the middle of the POR was because of the ban on EU honey. And if you look at everything, if you look at the totality as to what the DOC should have done, rather than go one by one, we think that the methodology was contrary to law and the decision was not supported by the evidence. I'd like to talk about, if you have more questions on the first issue, on the second really critical issue, which is financial ratios. And here, it's a little bit different. Here, the Department of Commerce had two financial statements. They had MHPC and they had APIS. And again, the results are just incredibly different. They accepted MHPC, which is an uplift on the honey price of approximately 40 percent because of the MHPC ratios, and they rejected APIS, which is an increase of less than 6 percent. So because of that decision, again, our margins are much higher than we believed would be proper. And the reason they rejected APIS is because they said that the financial statement was not complete because it didn't have an auditor's report on it. Well, the financial statement didn't have an auditor's report on it, but we don't believe that's sufficient for the Department of Commerce to throw out this statement, which came from APIS, and we had third-party evidence in the record that shows that APIS is one of the leading exporters of honey from India and had substantial domestic sales of honey in India. The APIS report also, and this is also very significant, if you look at the balance sheet in P&L, it has an auditor stamp on it, it has an auditor number, and it says that the auditors are chartered accountants. We really have a problem getting information from India, and everybody has a problem. But in this case, the Department of Commerce, they had an auditor number, they had chartered accountants, and they just said, well, it doesn't have a report, the statement's no good. And if the Department of Commerce had a problem... Well, do we have to assume that they said the statement's no good? What they concluded, as I understood it, was that the other statement, the MHPC, which I guess had auditor's notes and all of the schedules, was better, was more reliable. Well... Isn't that right? Well, they said it was more reliable because it didn't have the report. That was the reason. But if you look at the two statements, and assuming that our statement, let's say, had an auditor's report, would they have said that the MHPC was better? By our statement, you mean the APIS statement? I'm sorry, assuming the APIS statement had an auditor's report. I mean, the APIS statement, it's from a chartered accountant with a number, I assume it's a certified number, and it has a full set of schedules, and I think that's a factual mistake. If you look at the APIS auditor's report, you have schedules listed A to P under balance... So what do you want us to do here on appeal? To look at the two reports? The Commerce's judgment was, this one is more reliable because it has all of these notes and it has all these schedules and whatever, and we're supposed to, on appeal, say, no, they were equally reliable, notwithstanding more notes or more information on one than the other. Well, I mean... How are we to do that on appeal? I mean, one thing you could do, which I don't expect you to do, would say, you know, we're right and they're wrong. The APIS is more reliable. But one thing you can do on appeal is you can say, look, it doesn't have an auditor's report. Let's try to see if you could get an auditor's report. You have a chartered account. Let the Department of Commerce try to call somebody in India to see if there's an auditor's report. We don't even know if one ever existed. But let's give it another try to get an auditor's report. During the course of this proceeding, the Department of Commerce, a question arose as to information in the EDA data. So what did they do? They write a letter to EDA. The question arose during the course as to the Tribune article. What did they do? They go to the Tribune article, to the author of the Tribune article, and they ask him questions to go on the record. I'm not saying we don't... I'm sorry. You want to save three minutes? You're well into that time. We'll give you a full rebuttal. Thank you, Your Honor. Mr. Cassini, for the government. May it please the Court. Commerce relied on the best available information here. First, with respect to the EDA data for valuing raw honey, really the only issue that may be of any concern that plaintiffs raised is that somehow the export prices that were placed on the record for raw and processed honey were allegedly lower than the raw value, raw honey prices. However, those export prices were only lower after S. Well adjusted those prices using its own adjustments. In fact, the domestic industry adjusted those prices too and came up with a number that was higher than the surrogate value used by Commerce. Why not just consider all of this information and factor it in or out according to its strength? Well, that's exactly what Commerce did in determining that the... It rejects it outright. Why not account for it? Well, Commerce did, but it found... You could account for Kerala as being a region with lower prices. It would require a little more economic analysis, but you don't. You just reject it. But those articles that, say the Kerala article, were based on much smaller sample sizes or the source of the data... Market economy, they ought to be part of the equation, right? I mean, any price factors into the economy, right? Any price might factor into the economy, but a single small volume... But why do you exclude the three lowest? I mean, that looks a little suspicious. Well, Commerce... Put it in and then point out that it's a single point on a larger grid. Well, if the Department of Commerce were to do that... It might lower the price a little bit, but that may be appropriate. Well, in this case, any lowering of price would have been infinitesimal. The EDA data was based upon 700 beekeepers, and the other articles provided involved either only one producer or was clearly unreliable because there was absolutely no statement concerning where those prices came from, how the research was done, etc. And in fact, what Commerce did was the 75 value was more in the middle of all the prices. The Tribune article that S. Wells suddenly embraces was proffered originally by the petitioners because the values in the Tribune article were higher than the EDA data. So in fact, the Department of Commerce did not pick the highest value. The value that it ended up with was in the middle of the range of values that were out there. The appendix at 1809 discusses plaintiff's apparent anomaly, as does Appendix 714 and 717. Also, the plaintiff's concern about the fact that the EDA data only went for the first half of the period of review is not really relevant here. If you look at the appendix at page 1512, it demonstrates that 86% of the honey produced under the EDA data was produced in March through June. It was produced in the spring, and only 5% was produced in October. So even if the prices went down by October, that would have been a very, very small change in prices if there were an October EDA price. How do you reconcile the 25% higher normal value than the export price? How do they make a profit at all? Well, at page 32 of our brief, the first footnote, we explain the calculational issues that the plaintiffs raised. In fact, they took a simple average of the EDA data as opposed to a weighted average of the EDA data to come up with what they viewed the EDA normal value to be. But what the Department of Commerce did was took a weighted average because much more honey was produced during the spring. And we explain that fully in our brief at the first footnote in our red brief. So is the difference, is the argument here, I mean, what seems to me you're saying is because even if we had accounted for the other data, it would have affected it only by a small amount. So that's the rationalization for not accounting for it at all? No, it's not a rationalization. What it does is though it demonstrates that the plaintiff's claims that the Department of Commerce somehow skewed the data or came up with a patently unreasonable or absurd determination just doesn't hold up to the actual evidence before the agency. Well, in my view, they don't have to show that it was patently absurd. They can just show that it wasn't the best and you could have done better, right? Well, what the plaintiffs can show is that Commerce's determination that the EDA data was the best is unsupported by substantial evidence. And one way to do that because the substantial evidence standard is very deferential as Mr. Margot noted. But that's not, it's not necessarily picking between two stark alternatives which is EDA versus the three articles. What I think they're proposing is some combination. So even if EDA is much better clearly as a whole than looking at the other three, my question goes to why, it seems to me your answer to why Commerce shouldn't have included or taken account of those articles is simply that, well, harmless error. Even if it had, it wouldn't have made any difference. No, well, not at all because Commerce fully explained why it found those three other data sources to be unreliable and there would be, it would be unreasonable. But even with respect to the timing, I thought I understood you to just say, well, yeah, there was a problem with the second half but it wasn't the entire portion of the second half. It was just one quarter of the second half that should have been affected or treated differently. Well, it was 5% and the department. I thought you said October. That's correct. But if you look at page 1512 of the appendix, there's only certain months when honey is harvested. So there's, so different months have much larger percentages. And the primary type of. So the data, your argument is our data was only off by 5%. No, in fact, our data, if there was a spike in prices, the October 2002 data that Commerce used as a surrogate for October 2003 was before the date of the spike, any spike that's alleged by the plaintiffs. So in fact, Commerce's determination is consistent and internally accurate. And in fact, in the remand results, Commerce explained in great detail why the three articles were unreliable. And because of their unreliability, the agency and its professional judgment determined that it would not increase accuracy to add three unreliable sources to the average when there is reliable data. Well, the other side would point out that at least some of the articles or one of the articles was relied on by Commerce in another proceeding, which sort of calls into question your blanket statement that this information is unreliable, right? To say it's more reliable, but to say it's unreliable entirely is a bit of a stretch, isn't it? Well, the article that plaintiffs alleged was relied upon in a different proceeding was the Tribune article, which had even higher values. And Commerce determined not to use the Tribune article. And the plaintiffs aren't even alleging that Commerce should use the Tribune article because the surrogate value for honey under the Tribune article would be much higher than the value that the agency came up with in the final results. So, but the sources that plaintiffs proffer, none of those have ever been determined to be accurate by the agency. Turning to the use of MPHC financial statements, plaintiffs' biggest complaint about those statements is that it allegedly imposes a last-in, first-out accounting methodology that apparently skews the final results. If you look at page 8 of S. Wells' reply brief, you'll see a table where they talk about profits and losses under different accounting regimes. I just wish to note that under that methodology, according to plaintiffs, MPHC would have lost money under a first-in, first-out accounting methodology. Is honey perishable? I'm, there's no information on the record one way or the other about the perishableness of honey, but... But that would affect this, wouldn't it? It might affect it, but what really affects it here is the appendix at page 1525, which is a portion of the MPHC financial statement itself, where MPHC states that it made a profit. So what plaintiffs are attempting to do is impose a methodology where, that doesn't conform to the evidence. The third and final issue is the adjustment for commissions. The Department of Commerce simply followed the statute. Under 19 U.S.C. 1677 A.D. 1A, the Department of Commerce has to deduct commissions that were collected or that were paid in the United States by the respondent's affiliates. So that's what the Department of Commerce did here. Now, plaintiffs are alleging that somehow the agency has to make what's called a circumstances of sale adjustment between whatever costs were incurred by S. Well in China in selling the merchandise to its United States affiliate, and compare that with the sales experience of the Indian surrogate company. But under the statute, section 1677-18, sales of merchandise in non-market economy countries, quote, do not reflect the fair value of the merchandise. So there's simply no means of making such a circumstances of sale adjustment when the activities are conducted in non-market economy country and paid for with non-market country currency. And therefore, commerce was well within its construction of the statute in declining to make a circumstances of sale adjustment. Thank you. Thank you, Mr. Tresini. Mr. Liberta, representing the honey manufacturers. Yes, Your Honor. Thank you. Good morning. May it please the Court. Is honey perishable? No. Well, not in the sense that tomato or lettuce is perishable. It has a very long shelf life, a year, two years. But it's perishable? It will eventually degrade, yes. It's a natural product. But it does have a long shelf life. Long enough to justify the use of a LIFO presumption. That was simply an artifact of how commerce went about adjusting the data to come up with the profit number. It just turned out that it assumed a LIFO based on the kind of data they had before them. There's no evidence on the record that that necessarily skews the outcome. Yes, if you do LIFO or FIFO, there are two different outcomes. One's higher. One's lower. But there's no evidence that choosing LIFO versus that would be wrong compared to FIFO in these circumstances. What commerce was charged to do here was to use the best information available it had to it. For the EDA data, counsel for the Chinese industry has all but admitted that it was the best information that was on the record. When commerce compared it to the other information, it didn't say that the Tribune data was less, was not reliable at all. It said it was less reliable. And that data, the problem with trying to find a way to use all the data that the court has been concerned with this morning is how does one go about averaging the data when you have different levels of reliability? You have different, how do you weight it? Commerce could have, for example, said, okay, we're going to use the data that we got from the Tribune article and the Tribune author. That data ranged from 40 to 105. The median of those numbers, the average, the simple average of those numbers is right about 75. It's right about the number that the commerce department used. Those data actually support the number that commerce ended up using in this case. The Kerala article was found to be not reliable. Kerala. Or Kerala. Article was found not to be reliable. Averaging unreliable data or less reliable data with the best data doesn't give you a best information available standard in what it gives you. It just degrades the best information that you had. Why aren't all prices in a market economy reputable data points? If you had all prices across the whole economy, they might be. But what you had in this case were individual data points that didn't represent some kind of spectrum. In the EDA data, you had that. Now, it was for the second largest honey producing region in India. But it was many data points over a long period of time. These other points were single points in time in a single place. And so, it would unfairly weight the overall data toward those points. I see my time is about up. Thank you, Mr. Liberda. And I think Mr. Mosvack has a couple minutes of his talk. Thank you. Thank you, Yolanda. I'd like to make one point on the financial ratios. On the use of LIFO rather than FIFO. The Department of Commerce made a decision. They used LIFO. They didn't use FIFO. There was no reason for that decision. We're doing one. We're not doing the other. There was no reason why one was better than the other. But the reason we're making this point, we're not saying they should use FIFO. We're saying if you have to make a choice between LIFO and FIFO in a financial statement without having any reason to use one over the other, there's something wrong with that financial statement. To have dramatic difference, there's some flaw in that statement. And that's something the Department didn't consider. They threw out our statement because it didn't have an auditor's report. It didn't have a piece of paper. Instead of the piece of paper, we have a stamp and a certification and the possibility if the Department of Commerce would ask, they would be able to get that report if the report exists. Nobody knows. And they accepted a report where they arbitrarily selected LIFO rather than FIFO, which gives a difference. Wouldn't use of FIFO produce a negative profit? It probably would produce a negative profit. But that's what it would produce. I mean, the Department didn't say, didn't do LIFO because FIFO would produce a negative profit. The Department picked LIFO because they picked LIFO. There's nothing in the record that the WISE Department made that determination. What's critical to the record was the Department had to make a very important assumption. There was no ending inventory in that financial statement. There was no material cost in that financial statement. And because of that, the Department had to go into the air and say, we're going to use LIFO. Now, whether it's right or wrong may not be more important as the fact that the Department had to do it. They took a financial statement that had an incredible flaw and they tried to rehabilitate that statement. And we had a statement which the only thing that possibly is wrong with our statement is it's lacking one piece of paper saying the auditor is saying it's okay, where our certification and a number. Which you acknowledge, that piece of paper might not exist. It may not exist. In which case, what do we need to do? Send it back so you can have another audit? No, no. No, if the paper doesn't exist, that means our statement is complete. If the paper exists, let's try to have the Department ask to see if it exists and it will be put on the record. But the fact the Department just summarily threw out our financial statement because it didn't have just one piece of paper, which may never have existed, while at the same time accepted the financial statement, which admittedly didn't have an inventory, which made them make that decision. There's something fundamentally wrong with the process, which has such an incredible impact on the final result of the margin for the Department to be able to do this. And I shouldn't use the word get away with it, but that's what I'm going to say. It's just, it's wrong. They have discretion, but the discretion has to stop someplace. And we believe this is the place it should stop. Everything else is in our briefs. Thank you.